IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLOUCESTER TERMINALS, LLC, | : | |
| Petitioner, Counter-Respondent, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEAMSTERS LOCAL UNION 929, | : | No. 16-5322 |
| Respondent, Counter-Claimant. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                                                                                    **May 22, 2017**

When Gloucester Terminals, LLC ("GLT") fired Gary Akers in April 2016, the Teamsters Local Union 929 (the "Union") grieved his termination. GLT and the Union failed to resolve the grievance and, pursuant to their collective bargaining agreement ("CBA"), turned to J. Freedley Hunsicker, Jr. (the "Arbitrator") to arbitrate the dispute. The Arbitrator ruled that GLT had just cause to terminate Akers, but mitigated the penalty to reinstatement without back pay. GLT petitioned the Court to vacate the arbitration award, arguing that the Arbitrator lacked jurisdiction to mitigate the penalty and that his remedy failed to draw its essence from the CBA. The Union counterclaimed to enforce the award.

GLT and the Union have cross-moved for summary judgment. Although GLT and the Union do not agree about all the facts underpinning this dispute, they do not dispute the facts relevant to a request to vacate or enforce an arbitration award. Because the CBA gives the Arbitrator authority to decide the scope of his jurisdiction, and because the Arbitrator's decision draws its essence from the CBA, the Court will grant partial summary judgment in favor of the Union and will enforce the arbitration award.

I.  **BACKGROUND**

GLT is a limited liability company operating in New Jersey, and is an "employer" under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(2). (Pet'r's Statement of Undisputed Facts ¶¶ 1–2 [hereinafter "GLT Facts"].) The Union is an unincorporated association operating in Philadelphia, and is a "labor organization" under the NLRA, 29 U.S.C. § 152(5). (*Id.* ¶¶ 3–4.) At all relevant times, GLT and the Union were subject to a CBA, which outlines a multi-step grievance procedure that culminates in binding arbitration. (*Id.* Ex. A arts. XIV–XV [hereinafter "CBA"]; Resp't's Statement of Undisputed Facts ¶¶ 1–2 [hereinafter "Union Facts"].)

Several provisions of the CBA are relevant here. First—and critical to this dispute—the CBA states that the "Arbitrator shall determine any questions of arbitrability." (CBA art. XV(2).) Second, the CBA bars GLT from discharging any employee without "just cause." (CBA art. XIII(1).) Third, the CBA recognizes the right of the Union to appoint stewards, and allows stewards to investigate and process grievances without loss of time or pay, subject to the other provisions of the CBA. (CBA art. XI.) Finally, the CBA grants GLT the right to promulgate rules governing employee conduct. (CBA art. XXVI.) Group I, Rule 5 prohibits a worker from being "insubordinate or deliberately fail[ing] to carry out Supervisor's instructions," and Group I, Rule 12 prohibits a worker from "[l]eav[ing] the plant or work area during work hours without the permission from the Supervisor." (GLT Facts ¶¶ 11–12; CBA Schedule E.) Violation of either of these two rules "shall warrant immediate dismissal." (GLT Facts ¶¶ 9–10; CBA Schedule E.)

A.  **GLT Terminates Akers in November 2014**

Akers worked as a warehouseman and Union steward. (GLT Facts ¶ 14; *id.* Ex. C, at 1 [hereinafter "Arb. Op."].) In November 2014, GLT terminated Akers for "being insubordinate/deliberately failing to carry out supervisor's instructions and leaving the plant or

2

work area during working hours without the permission from the Supervisor." (*Id.* ¶ 15; *id.* Ex. B.)[1] The Union grieved Akers's termination, and agreed to settle the grievance with GLT under the terms of a Last Chance Agreement ("LCA"). (*Id.* ¶¶ 17–18; *id.* Ex. B [hereinafter "LCA"].) Under the LCA, GLT reinstated Akers with a three day suspension. (*Id.* ¶ 19; LCA.) The LCA also provided a framework for any relevant future disputes: any subsequent violation by Akers of certain GLT rules would result in immediate termination, and if the Union grieved the termination, the Arbitrator would only have jurisdiction to determine whether Akers violated the rules. (GLT Facts ¶¶ 20–21; LCA.) As stated in the LCA:

> With this agreed-upon clarification of the relevant provisions of the contract, [GLT], the Union and Mr. Akers agree that any subsequent violation by him of the rules governing leaving his assignment without a supervisor's permission will result in immediate termination. Should the Union elect to challenge that termination in arbitration, the arbitrator shall have jurisdiction only to determine whether the offense took place and shall not have jurisdiction to reduce the penalty, however, if [GLT] cannot prove that Mr. Akers did not [*sic*] violate the terms of this Agreement, the arbitrator shall have jurisdiction to reinstate Mr. Akers and make him whole.

(GLT Facts ¶¶ 20–21; LCA.)

### B. GLT Terminates Akers in April 2016

A year and a half later, GLT assigned Akers to work mandatory overtime on or about April 7, 2016, which is allowed under the CBA. (GLT Facts ¶¶ 7, 22; Union Facts ¶ 4; CBA arts. VIII, X.) Akers did not, however, work the mandatory overtime on April 7. (GLT Facts ¶ 23; Union Facts ¶ 5.) Although GLT and the Union dispute whether Akers received permission to leave, the Arbitrator concluded that "there is no evidence that anyone gave express and final permission for Akers to leave early." (Arb. Op. at 6.) The next day, GLT terminated Akers for violating two rules: Group I, Rule 5 (insubordination) and Group I, Rule 12 (leaving a plant or

---

[1] The Union disputes that Akers was fired for leaving his work area without permission, but does not provide an alternative reason. (Resp't's Resp. GLT's Undisputed Facts ¶ 15.)

3

work area during work hours without permission from a supervisor). (*Id.* at 1; GLT Facts ¶¶ 26–27; Union Facts ¶ 6.)

The Union again grieved Akers's termination. (GLT Facts ¶¶ 28–29; Union Facts ¶ 7.) Unable to resolve the dispute, GLT and the Union turned to final and binding arbitration. (GLT Facts ¶¶ 30–31; Union Facts ¶ 8.) The Arbitrator conducted a hearing in August 2016, during which both GLT and the Union presented testimony. (GLT Facts ¶¶ 32–35; Union Facts ¶¶ 9–13.) The Arbitrator issued his opinion a month later. (Arb. Op. at 1.)

### C. The Arbitration Opinion

As identified by the Arbitrator, the issue in this case was "whether [GLT] had just cause for the discharge" of Akers in April 2016. (*Id.*) The Arbitrator outlined arguments from both sides; as relates to the LCA, GLT claimed that Akers had violated the LCA, while the Union argued that GLT could not rely on the LCA as grounds for discharge because it was not cited as a basis for discharge and because it arose in a different context. (*Id.* at 2–4.) After summarizing all the evidence, the Arbitrator concluded that GLT "has proved that Akers left assigned mandatory overtime without his supervisor's permission and has met its burden of just cause" under the CBA. (*Id.* at 6.)

Instead of affirming the termination, however, the Arbitrator chose to mitigate the penalty to reinstatement without back pay. (*Id.* at 7.) The Arbitrator concluded that "there was some confusion among [GLT] supervisors as to [GLT's] right to enforce by immediate discharge [the rules prohibiting leaving without permission]." (*Id.*) The Arbitrator specifically referenced an incident that took place one week before Akers's termination, during which five employees refused to work mandatory overtime. (*Id.* at 5.) Several of these employees were terminated, but two were not "because it appeared they weren't aware . . . that leaving early might lead to their dismissal." (*Id.*) He found that GLT "could have more effectively communicated its position the

4

consequences [*sic*] of leaving early," and as a result, "some employees were unaware that going home without permission could cost their job." (*Id.*) Due to this confusion, and "based on the facts in this case, and in this case only, the discharge penalty should be mitigated." (*Id.* at 7.)

In the section of his opinion discussing the case and his conclusions, the Arbitrator mentioned the LCA only once:

> Akers was not reasonable in leaving early without permission. He was aware that [GLT] was upset and was ready to enforce its right to require overtime by discharge as it had the previous week. **While it is not a basis for his termination, the very fact that leaving work early, albeit for other reasons, almost cost Akers his job and resulted in his Last Chance Agreement, should have made Akers far more cautious.**

(*Id.* at 6 (emphasis added).)

### D. Procedural History

GLT filed a petition to vacate the arbitration award pursuant to Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. The Union counterclaimed to enforce the arbitration agreement. Agreeing that there are no relevant facts in dispute, GLT and the Union have cross-filed for summary judgment.

In its motion for summary judgment, the Union has also requested attorney's fees and prejudgment interest in the form of the back pay Akers would have received from the date of the Arbitrator's award until today. GLT opposes these requests.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary

5

judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248.

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

A court must apply the same standards to cross-motions for summary judgment. *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987); *see also Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994).

## IV.  DISCUSSION

### A.  Standard of Review of Arbitration Decisions

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he or she has not agreed so to submit." *United Steelworkers of Am., AFL-CIO-CLC v. Lukens Steel Co., Div. of Lukens*, 969 F.2d 1468, 1473 (3d Cir. 1992) (internal quotation marks and brackets omitted). When a contract "contains an arbitration clause, there is a presumption of arbitrability." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). In other words, all disputes are presumed arbitrable unless there is "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal quotation marks omitted). Any doubt "should be resolved in favor of

coverage." *Id.* (internal quotation marks omitted). But parties cannot be forced to arbitrate if an agreement "contains an express provision excluding a particular grievance from arbitration." *Lukens Steel Co.*, 969 F.2d at 1475 (internal quotation marks and duplicate omitted). "The party contesting the presumption of arbitrability bears the burden of producing strong and forceful evidence of an intention to exclude the matter from arbitration." *Id.* (internal quotation marks omitted).

"Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question who has the primary power to decide arbitrability turns upon what the parties agreed about *that* matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (internal citations and quotation marks omitted). Questions of arbitrability are presumptively left to the court's independent determination "unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotation marks and alteration omitted).

When the arbitrator has authority, "[t]here is a strong presumption under the Federal Arbitration Act in favor of enforcing arbitration awards." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005) (internal citation omitted). Arbitration awards are presumed valid, and can only be vacated for one of the four grounds detailed in the Federal Arbitration Act, 9 U.S.C. § 10(a). *Id.* Relevant to this petition, a district court may vacate an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." § 10(a)(4).

A reviewing court is barred from "reconsider[ing] the merits of an award[,] even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). In

7

addition, "interpretation of a collective bargaining agreement is more than just an analysis of its language; it requires the Court to look beyond the face of the collective bargaining agreement, and consider the practice, usage and custom pertaining to the terms of the CBA." *Acosta v. HOVENSA LLC*, 529 F. App'x 297, 301 (3d Cir. 2013) (internal quotation marks omitted); *see also United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 581–82 (1960).

"Only where there is manifest disregard for the agreement can [a court] override an arbitrator." *Brentwood Med. Assocs.*, 396 F.3d at 243. In the labor context, a court will ordinarily not vacate an arbitration award unless it fails to draw its essence from the CBA and instead "represents the arbitrator's 'own brand of industrial justice'" *Tanoma Min. Co. v. Local Union No. 1269, United Mine Workers of Am.*, 896 F.2d 745, 747–48 (3d Cir. 1990) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)); *accord Pa. Power Co. v. Local Union No. 272, Int'l Bhd. of Elec. Workers, AFL-CIO*, 276 F.3d 174, 178 (3d Cir. 2001).

"An award draws its essence from a collective bargaining agreement if its interpretation can *in any rational way* be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." *Brentwood Med. Assocs.*, 396 F.3d at 241. A court will enforce an arbitration award even if the court "disagree[s] with the arbitrator's conclusions under the law" or finds the basis of the arbitration award to be "ambiguous." *Id.* (internal quotation marks and alternations omitted). If an "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (internal quotation marks omitted). "So long as the arbitration award has some support in the record, and the arbitrator has not

manifestly disregarded the law," a court must affirm the award. *Eichleay Corp. v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 944 F.2d 1047, 1056 (3d Cir. 1991).

"Settlement agreements (such as the Last Chance Agreements) between parties to a collective bargaining agreement containing a broad arbitration clause are arbitrable when the underlying disputes are arbitrable, except when the parties expressly exclude the settlement agreements from arbitration." *Lukens Steel Co.*, 969 F.2d at 1475.

### B. The Court Must Defer to the Arbitrator's Conclusions

The arguments made by GLT and the Union reduce down to a single question: did the LCA apply to Akers's termination in April 2016? If the LCA applied, then the Arbitrator would be bound to the clause stripping him of jurisdiction to mitigate the penalty; if the LCA did not apply, then the Arbitrator would be bound to the CBA and regular arbitration principles in determining whether GLT had just cause to terminate Akers, which include authority to mitigate the penalty. GLT argues that the LCA applies; the Union argues it does not. After reviewing arguments by both sides, the Arbitrator evidently found that the LCA did not apply. Because the Arbitrator plausibly determined that the LCA did not apply, the Court must defer to his conclusion.

### i. The Court Defers to the Arbitrator's Determination of His Jurisdiction

Questions of arbitrability address whether the parties have submitted particular disputes to arbitration—i.e., they determine an arbitrator's jurisdiction. Arbitrability questions "are limited to a narrow range of gateway issues," including "'whether the parties are bound by a given arbitration clause' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 331 (3d Cir. 2014) (quoting *Howsam*, 537 U.S. at 84). Regardless of *who* decides arbitrability,

disputes arising from contracts containing arbitration clauses are subject to the presumption favoring arbitration. *See AT&T Techs., Inc.*, 475 U.S. at 650.

The Supreme Court has held that when "parties agree to submit the arbitrability question itself to arbitration," the "court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *Kaplan*, 514 U.S. at 943 (citing 9 U.S.C. § 10). In the CBA, GLT and the Union unambiguously agreed that the Arbitrator "shall determine any questions of arbitrability." (CBA art. XV(2).) In other words, the CBA gives the Arbitrator authority to determine his own jurisdiction.

Whether the LCA stripped the Arbitrator of jurisdiction to mitigate Akers's 2016 termination is one such question of arbitrability: it asks if the arbitration clause in the "concededly binding" CBA applies to the penalty imposed by GLT for Akers's rule violation. *See Opalinski*, 761 F.3d at 331. Because the CBA gave the Arbitrator authority to determine questions of arbitrability, this Court must "give considerable leeway" to the Arbitrator's determination of whether the LCA applied. *See Kaplan*, 514 U.S. at 943.

Whether the LCA applies to Akers's 2016 termination is a close question. The LCA did warn Akers of termination if he violated "the rules governing leaving his assignment without a supervisor's permission," and stated that if the Union grieved that termination, "the arbitrator shall have jurisdiction only to determine whether the offense took place and shall not have jurisdiction to reduce the penalty." (LCA.) But the Union correctly observes that the LCA was negotiated in the context of a dispute about CBA Article XI, Section 2, which allows shop stewards to investigate and process grievances without loss of pay. (Resp't's Resp. Pet'r Mot. Summ. J. 7.) Most of the LCA focused on clarifying that Akers's steward responsibilities do not excuse him from other GLT rules, including the rule prohibiting an employee from leaving his

work area without permission. (LCA.) The much-contested paragraph about an Arbitrator's jurisdiction over a termination penalty comes after this discussion of CBA Article XI, Section 2, and the opening sentence reads in full:

> *With this agreed-upon clarification of the relevant provisions of the contract*, [GLT], the Union and Mr. Akers agree that any subsequent violation by him of the rules governing leaving his assignment without a supervisor's permission will result in immediate termination.

(*Id*. (emphasis added).)

In his decision, the Arbitrator acknowledged GLT's argument that the LCA applied to Akers's 2016 termination. (Arb. Op. at 3.) He also acknowledged the Union's arguments that the LCA did not apply because GLT never cited it as a basis for Akers's 2016 termination and because the LCA arose in the context of Akers's steward responsibilities. (*Id.* at 4.) The Arbitrator appears to have adopted the Union's position: later in his opinion, he observed that the LCA "is not a basis for [Akers's] termination" because Akers left work "for other reasons." (*Id.* at 6.) Because the LCA was not a basis for Akers's 2016 termination—i.e., GLT did not fire Akers for violating the LCA—it follows that the LCA would not strip the Arbitrator of jurisdiction to mitigate the penalty. The Court finds that the Arbitrator sufficiently distinguished the LCA based on "an arguable interpretation and/or application" of the LCA. *See Brentwood Med. Assocs.*, 396 F.3d at 241.

The Court is bound to honor the Arbitrator's choice "[w]hen two plausible interpretations" of the LCA exist. *Arco-Polymers, Inc. v. Local 8-74*, 671 F.2d 752, 757 (3d Cir. 1982) (internal quotation marks and citation omitted); *see id.* at 755 ("[C]ourts should not disturb ambiguous, unclear, and even deliberately opaque arbitration opinions because the policy in favor of the peaceful resolution of labor disputes through arbitration outweighs any damage which arbitration might cause." (internal quotation marks omitted)). Because the CBA vests the

Arbitrator with authority over his own jurisdiction, and because the LCA arguably did not apply to Akers's 2016 termination, the Court finds that the Arbitrator did not exceed his jurisdiction. *See Brentwood Med. Assocs.*, 396 F.3d at 241 (upholding an arbitration award provided it "can *in any rational way* be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention").

### ii. The Arbitration Award Draws Its Essence From the CBA

Because the Arbitrator did not exceed his jurisdiction, the Court must now consider whether the arbitration award drew its essence from the CBA. As with the Court's consideration of the Arbitrator's determination of his own jurisdiction, the Court's review is extremely deferential. "Only where there is manifest disregard for the agreement" can a court override an arbitrator. *Id.* at 243.

GLT argues that the Arbitrator disregarded the plain language of the CBA, as modified by the LCA. (Pet'r's Mem. Law. Supp. Mot. Summ. J. 11–13.) Because the Court has already concluded that the Arbitrator distinguished the LCA, the only section of the CBA that the Arbitrator could have "manifest[ly] disregard[ed]" is the section discussing Group I rules, which states that these rules are "of such importance that no violation can be tolerated and any violation shall warrant immediate dismissal." (CBA Schedule E.)

But the Union correctly points out that that the "labor arbitrator's source of law is not confined to the express provisions of the contract." *United Steelworkers of Am.*, 363 U.S. at 581. Instead, "the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *Id.* at 581–82; *accord Acosta*, 529 F. App'x at 301 ("[I]nterpretation of a collective bargaining agreement is more than just an analysis of its language; it requires the Court to look beyond the face of the collective bargaining agreement, and consider the practice, usage and custom pertaining to the terms of the

CBA." (internal quotation marks omitted)). Here, the Arbitrator chose to mitigate Akers's termination because "there was some confusion among [GLT] supervisors as to [GLT's] right to enforce by immediate discharge" and "some employees were unaware that going home without permission could cost their job." (Arb. Op. at 7.) In particular, the Arbitrator found that when five employees skipped mandatory overtime only a week before Akers's termination, GLT had *not* terminated two of the employees because they weren't aware of the consequences. (*Id.* at 5.) GLT's failure to "effectively communicate[] its position the consequences [*sic*] of leaving early" led the Arbitrator to mitigate Akers's termination "in this case, and in this case only." (*Id.* at 7.)

Because the Arbitrator's decision could rationally be drawn from the CBA and industrial common law, the Court finds that the Arbitrator did not exercise "manifest disregard" for the CBA. *See Brentwood Med. Assocs.*, 396 F.3d at 243; *Acosta*, 529 F. App'x at 301. As a result, the Court defers to the Arbitrator and enforces the arbitration award.

### C. The Union's Request for Attorneys' Fees and Prejudgment Interest

In addition to enforcement of the arbitration award, the Union has requested attorneys' fees, along with prejudgment interest in the form of the pay Akers would have received from the date of the award until today. (Resp't's Mem. Law Supp. Mot. Summ. J. 13–14.) GLT opposes both requests. (Pet'r's Resp. Resp't's Mot. Summ. J. 6–7.)

In the American legal system, "each party normally must bear the burden of its own legal expenses, including attorneys' fees." *Mobil Oil Corp. v. Indep. Oil Workers Union*, 679 F.2d 299, 305 (3d Cir. 1982). Courts depart from this default only when "the losing party litigated in bad faith, vexatiously, or for oppressive reasons." *Id.* Here, the Union has not presented evidence that GLT litigated vexatiously or in bad faith. To the contrary, even though the Court must defer the Arbitrator's conclusions, the CBA and LCA are subject to several reasonable interpretations.

An unsuccessful challenge is not *per se* meritless or vexatious. Therefore, the Union is not entitled to attorneys' fees.

District courts have discretion to award prejudgment interest in claims arising under federal labor law. *See, e.g.*, *Ambromovage v. United Mine Workers,* 726 F.2d 972, 981–82 (3d Cir. 1984); *Kinder Morgan Bulk Terminals, Inc. v. United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, & Its Local 1*, 9 F. Supp. 3d 507, 522 (E.D. Pa. 2014). The court should award prejudgment interest "'in response to considerations of fairness'" and should deny prejudgment interest "'when its exaction would be inequitable.'" *Ambromovage*, 726 F.2d at 981–82 (quoting *Bd. of Comm'rs of Jackson Cty., Kan. v. United States*, 308 U.S. 343, 352 (1939)). "Prejudgment interest is usually available when the damages are ascertainable with mathematical precision." *Kinder Morgan Bulk Terminals, Inc.*, 9 F. Supp. 3d at 522 (internal quotation marks omitted).

Prejudgment interest and back pay are not, however, the same thing. Prejudgment interest compensates a party for "the loss of use of money due as damages from the time the claim accrues until judgment is entered." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 196 (1995) (internal quotation marks omitted). Back pay, by contrast, compensates an employee for the salary he should have received for a fixed period of time in the past. Here, before the Court can award prejudgment interest on back pay, it must decide whether an award of back pay is warranted. *See Kinder Morgan Bulk Terminals, Inc.*, 9 F. Supp. 3d at 522 (enforcing arbitration award that granted reinstatement with back pay to employee, and awarding the employee prejudgment interest in the back pay owed).

The Court finds that Akers is entitled to back pay from the date of the arbitration award to today. *See Mansfield Plumbing Prod., LLC v. Teamsters, Chauffeurs & Helpers Local Union*

*No. 40*, Civ. A. No. 05-1687, 2005 WL 3544085, at *7 (N.D. Ohio Dec. 28, 2005) (discussing cases in which courts have "awarded back pay for the periods between arbitrator-ordered reinstatement and final court rejection of challenges to reinstatement"). The Arbitrator ordered GLT to reinstate Akers as of September 13, 2016, with no back pay from the date GLT fired Akers. (Arb. Op. at 7.) But the Arbitrator unambiguously expected GLT to promptly reinstate—and pay—Akers as of September 13, rather than (unsuccessfully) challenge the award in district court. *See United Steelworkers of Am., Dist. 36, Local 8249 v. Adbill Mgmt. Corp.*, 754 F.2d 138, 140, 142 (3d Cir. 1985) (finding that an arbitration award ordering an employer to "reinstate all of the grievants to their former employment, but without back pay" to be unambiguous). Moreover, GLT did not seek to stay the Arbitrator's decision. *See Mansfield Plumbing Prod., LLC*, 2005 WL 3544085, at *7. Therefore, Akers is entitled to back pay for the period from September 13, 2016 to May 22, 2017.

Because the parties have not submitted detailed briefing on how much back pay GLT owes Akers, the Court will retain jurisdiction and will order briefing on facts relevant to calculate said back pay, including: the date that Akers would have started work after September 13, 2016, the number of hours he would have worked, and his salary. The Court will also consider arguments that Akers is entitled to prejudgment interest on that back pay.

## V. CONCLUSION

The Court finds that the Arbitrator had authority to determine his own jurisdiction, and concludes that his determinations about his own jurisdiction, the CBA, and the LCA are entitled to substantial deference. As a result, the Court will deny in full GLT's cross-motion for summary judgment, grant in part the Union's cross-motion for summary judgment, and enforce the arbitration award. The Court will also deny in part the Union's cross-motion as it concerns

attorney's fees, and will order additional briefing on the Union's request for back pay and prejudgment interest.

An Order consistent with this Memorandum will be docketed separately.